Ometu v. City of San Antonio et al. We'll hear from Ms. House. You may proceed, ma'am, please support. My name is Artesa House. I represent Appellant Mathias Ometu in this particular matter. Mathias Ometu had a Fourth Amendment right when he was jogging in the street in the City of San Antonio, Texas. This case is about a violation of Mr. Ometu's Fourth Amendment right when he was jogging down the street in the City of San Antonio on August 25, 2020. This case is also about the City of San Antonio's liability under Monel 42 U.S.C. 1983, which creates a private cause of action for damages against local governments for unconstitutional policy, either by an actual written policy or an unofficial custom or practice exercised repeatedly. The District Court reversibly erred when it granted summary judgment in favor of the defendant appellees, Devin Day, Richard Cerna, and the City of San Antonio, where there is a genuine disputed issue of material fact that remains to be litigated, which precluded the entry of summary judgment in favor of the appellees. The District Court erroneously ratification of the magistrate's judge adoption of false narratives of Officer Day and Cerna adjudicating without sufficient evidence was presidential to the appellant. But it is abundantly clear from the video evidence which the magistrate judge accurately relied on that the reason Ometu was stopped is because he appeared to match the description of a domestic violence perpetrator. Would we have to find that the magistrate judge was clearly erroneous in its determination that he matched the description? Obviously, your client has a very large beard, and the alleged victim said that, or complainant, said that it just had a little bit of scruffy and did not have, there was no indication that he, so that was a huge difference between the person. But do we have to find that the determination that he was similar to the description or matched the description is clearly erroneous for you to win today? Well, Judge, I believe that it is relevant due to the fact that whether or not the officers were in a lawful position to even stop Mr. Ometu on that day, I'd like for the court to take judicial notice. On August 25th, 2020, we were in COVID. So that was during a time where people were encouraged to go outside and engage in activities such as running. That is what Mr. Ometu was doing on that day. He was engaged in an activity that would not make him reasonably suspicious of committing a crime. And in fact, he was charged with a crime on that day. As of today, those charges have been dropped. And so, and not only that, the actual suspect that was identified by the alleged victim had a robbery warrant at the time. A reasonable officer in that position could have pulled up the record from dispatch and saw that this is what the actual alleged perpetrator looked like because he was in a domestic relationship with the alleged victim. And they knew during the encounter that he had the robbery warrant? Absolutely, not only- Sometime during the encounter, before they decided to take this gentleman over to the alleged, the complainant's home or not, when did they first learn about the robbery warrant? Right, and I believe that that's the question that deems necessary. Whether or not a reasonable officer in the position of Officer Day and Cerna could have pulled up the dispatch record because it was there at the time that the dispatch record could have been pulled up from Day and Cerna, and they failed to do so. No, they didn't know that he had the robbery warrant? So we're talking, there were two particular sets of police officers. There were officers that responded to the actual apartment where the alleged incident occurred. Then there were a set of officers that- Who with the gentleman with your client? I'm talking about those two. They didn't have that information and it wasn't conveyed to them, or was it? I don't know that, Judge. It seemed like the officers were not conveying information because it would have been super easy to take his picture and say, show this to her, and you wouldn't have been trying to push him into the car and all of that. It was just very strange. Absolutely, not only that, Judge, the apartment was right there. The alleged victim could have been brought there in order to identify my client, which is what he suggested. They refused to, so rather than taking that alleged victim and bringing her, or even with the technology that we have today, FaceTime, taking a picture, being able to transpose that, there were various things that could have been done, including pulling up the dispatch records to determine that there was already a mugshot of the alleged perpetrator. Counsel, wasn't that mugshot several years old? It seems to me that the principal distinction may be in the length of the beard and a shot from several years earlier of the right, apparently the right perpetrator, whether he had a long beard at that time wouldn't indicate whether he had a long beard now. Was that an old picture that you keep talking about pulling up the picture from the earlier arrest? So here's what I would say. Regardless of whether or not that that was an old mugshot or not, here is what was readily apparent. What would not have changed is the fact that the alleged perpetrator had lighter skin than a darker skin Marty Omitu. The only thing that they had in common was the fact that they are African American. What did not change. He had green shorts and had just come out of the complex where the, I thought one of the officers saw your client come out of the complex or near the complex where this event occurred. He had similar clothing on. They were trying to get to the bottom of it. So my client actually, he lives at the complex. He was leaving that complex. Right, but the officer had limited amount of information. And actually the assaulter, being somebody who lives at the department, wouldn't be beyond the scheme of reasonable set of events. So I don't see how that particularly matters. But he lived there. The event happened there. And whether he lived there or not, the event happened there. And he was near there when the officer first saw him. So help me with why, it seems to me a principle argument is when you juxtapose the older picture of the actual, I guess it's conceded the actual perpetrator and your client, they look quite different. But what do the officers have to go on at the time to show your client looked dramatically different than what the other fellow might have looked at, looked like at the time of the offense several years after that picture? Yes, Judge, they actually had the actual alleged victim there to describe what the alleged perpetrator looked like at that time. Didn't they ask your client, will you go with us over to this apartment you said is closed and let her see you? I'm sorry, I didn't hear you, Judge. Didn't the officers suggest them, you say they should have brought Davenport, was that her name, is that her name, to him. They didn't at least suggest let's take your, you, your client, over to Davenport. So what a jury would have been able to do was take judicial notice of the fact that even police chief officer William McManus himself stated that my client had no reasonable duty in order to identify himself or do exactly what the judge is asking of these officers to do. The question is, what would have been the least intrusive measures that wouldn't have violated my client's Fourth Amendment protections when it comes to their investigation? You have two sets of officers, and in fact, the first set of officers' evidence proves that had interaction with the actual perpetrator that never left the scene. He was sitting right there on the stairs when the officers that responded to the apartment building asked where the location of the apartment was. He never left the premise. He was there. And so when we talk about qualified immunity and whether or not the officers avail themselves of the protection of qualified immunity, it does not protect the incompetent of officers. And so based on their incompetence displayed on that day, we are holding that note. He didn't have a duty to do that, he didn't. Not only that, the police chief said he didn't have a duty to go with them and there were other measures that my client, not the officers, offered that could have been done in order to identify him. But regardless of the picture, you had an actual victim that provided a description of her partner that did not match Mr. Omitu. So outside of clothing and the fact that they were African American, their height was not the same, their skin tone was not the same. The amount of hair on their body was not the same. And in fact, what you will see is there is an omission of even, we're holding that the alleged perpetrator looked like that same picture as of that day. You will not see a picture that is different because if it was, the city of San Antonio would have offered you a different description of the alleged perpetrator with a full-grown James Harden beard, which he did not have. The description, though, doesn't really, the picture of the arrest doesn't really matter if just in light of the suspect's description, I mean the victim's description. I mean, once she says he does not have just a little scruff, it's not matching. What was your initial, what, there are two descriptions from Davenport, the first being that he had kind of a beard, which is ambiguous what that would mean, and then she gave a later one, and were those the facts, and what were the two descriptions? Right, it was my understanding that at first she was asked whether or not there was a beard. She said kinda, right? And then there was something of a scruffy description. But there is no, without debate, Mr. Marty Amitu has a James Harden beard. That's not a sign. He has a full beard. It's not kind of a beard. This man has a beard. And he never matched the description. Not only that, and there's something to take into place. When you are dealing with your interaction with those that are going to be suspects, you have to understand the actual, when we talk about race and racial profiling, you have to understand that when you are identifying suspects, that the tone of the skin matters. And here, they have a different tone of skin as well. So when we're talking about, and not only that, let's look at the hair. My client has a receding hairline and is going kind of bald. The actual suspect has a full head of hair without a receding hairline. Did Davenport make either one of those descriptions? Was her description indicating how dark the skin was, what his hairline was? I mean, is that relevant? The question is, who was in the lawful position to ask for a description of the suspect? That would have been the San Antonio police officer. Now, whether or not they did that or not, that was their failure. But their failure should not infringe upon my client for the minimum right to be a black man running during COVID. Does Samming argue that your client was doing exactly what is in his rights? To refuse to give his name, that's within his rights. To refuse to participate in the investigation, that's within his rights, assuming, and that the police chief said, it's totally within his rights. Don't you have to deal with the fact that there's this statute, though, that says that they can transport him? Which is rather surprising that you can transport someone in an investigation, but the statute says that. And it's just a short distance that they would be transporting him. So, when he started resisting the transport, at first, you might think in the abstract that that's totally within his rights because they can't take him somewhere just when they're doing an investigation. But then when you see the penal code that says they can transport him, what do you do with that? Are you saying that's unconstitutional, or is that, what do you do with that? Absolutely. We believe that this is unconstitutional for several, several reasons, including we believe it's unconstitutional and infringes upon the Fourth Amendment right. I don't believe that this particular issue has been litigated in front of the court. I believe it should, because the question is, what was the least intrusive means when it comes to constitutional protections that they could have achieved their desired result? But then, if it's in the statute, though, doesn't that make your qualified immunity argument really a tough row to hoe for you? Because if a reasonable officer could rely upon the statute that says you can transport a person during an investigation. I will note that he was never transported. They ended up bringing Ms. Davenport to identify where he was. Right, but that's what they were putting him in the car to transport him, weren't they? They weren't putting him in the car because he was acting up or something. They were putting him in to transport him. Well, it was my understanding they were putting him in the car because of his unwillingness to provide the information that they were asking for, such as providing a photo ID. Not many people run with a photo ID. So it wasn't to transport him across the parking lot. They were asking him to do so. When he offered alternatives, they took him up on the alternative. He wasn't on the parking lot. He was on a, there's a sidewalk. Yeah, the sidewalk. So the car pulled up. We have the video. Directly on that sidewalk. And so he offered alternatives. They actually entertained his alternatives. But even after being identified that he was not the alleged perpetrator, they continued holding him to the point where he was charged with a crime that has since been dismissed. When, okay, tell us about that. When do you believe that they had determined he was the wrong person and continued to detain him? And how long did that last? Well, it was my understanding that it was almost an hour and a half that they still had him detained after they brought the, so the first issue, allegedly, when they brought the girl, she identified that's not him. He was still in the police car. He never left that police car. They remained there. There are videos showing that he remained in detention even after that point. So I'm. Was that because of the sense that he had assaulted the officers? Weren't they holding him then for that? So we talk about assault, we have to talk about a crime that he had been charged with and then found guilty of. He was never charged. So we're looking at qualified immunity. And so we're looking at what the officers could have or would have known they could do or could not do. Later developments, to some extent, are relevant, but I don't think they're. So, but there was no. Relevant in what was occurring at that time. Right, but Judge, there was no assault. So if we had a charge, if we had a crime that he was actually found guilty of, I hear you, but there was no assault. And I think that's their issue. Thank you, we have your argument. Mr. Fitzpatrick. Sean Fitzpatrick for Richard Cerna and Devin Day. I guess I'll work backwards from where you left off. There was an assault. The assault was caught on video and the assault was Mr. Umetu kicking both of the officers. There was probable cause for that offense and he was arrested. Why were they allowed to put him in the car at all? Why can't, he wasn't running away or doing anything that would impede the investigation. Why did they get to put him in the car and say we're gonna drive you somewhere? So ascertaining the identity of the suspect at that point was a lawful objective of an investigatory stop. And the officers could, in fact, rely on the penal code with respect to its allowing them to transfer a suspect for a show up. The cases in this court support that. There's the Benjavinga case. I believe that was a border crossing where they moved a person from next to the bus and they took her over to the inspection trailer so that they could run a dog search on her to look for drugs. There's the Sam case where officers found a suspect across the street, across the highway in a parking lot. He was a suspect in a robbery at the Walmart nearby. They put him in the car. They took him over to the Walmart for a show up. The employee at the Walmart indicated that that was not the person who had shoplifted there and then the police officers continued to, well, they actually transported him back to the police station and they held him there until his mother came to pick him up. Do you think that the officers used common sense in this thing? They may not have to use common sense. I think they did use common sense. If they couldn't have just taken a picture of the man in two seconds and gotten to the bottom of this rather than escalating it every step. You are, but the point is valid. I'll concede the point. However. Because they escalated it every bit. They were ratcheting it up and he's getting more and more frustrated and they're ratcheting it up. I completely disagree that that's what is reflected in the objective video evidence, Your Honor. In the Scott V. Harris objective video evidence, you don't see them getting more and more and then throwing him into the back of the car and all of that. That was like. There was no escalation up to that point, Your Honor. Let me address your photo question. The question of the video and what I saw was that they objected to the handcuffs being tight and they loosened them at his request. And it was an aggressively calm situation. And at least, of course, the video. They were getting it in the car. And then they got him to jump in the engine. Indeed, throughout the encounter, I believe that both officers tried to deescalate the situation by engaging him in small talk, telling him that he was not under arrest, telling him why they were holding him because he met the description, as they understood it at the time, of a suspect in a domestic abuse case. The crime at issue was serious. The woman was choked to the point of unconsciousness and struck by her partner. There was a legitimate reason to find out who this person was and whether he was the person who they thought he was. It turned out that he wasn't. Let me address the Chief Judge question about the phone and taking a picture. That is explicitly asking to apply 20-20 hindsight to this situation. And the law in this circuit is that you can't determine whether one act is reasonable by comparing it to other acts, even if those other acts are more reasonable. Does the policy of the department allow you to try to bring perpetrators with victims? I thought the whole idea would be to try to keep them separate after an incident such as this. So the idea that they're trying to bring them together at the home of the person who's been, that seems very against most domestic violence policies. Well, I don't think they're gonna bring them together and put them both in a room. Well, they're bringing him over there when he's far away, I mean, a reasonable distance that he can't do any harm if it was a, it just seems not in accordance with how you handle domestic violence calls. But nonetheless, what about the beard? The beard is a big problem, isn't it? The beard is the only piece of the totality of circumstances on that day that cut against Mr. Omitu being identified as the suspect who was described. It's a big piece of evidence. It is, Your Honor, but it is just a piece of the evidence. So look at the rest of the evidence. When Officer Serna first showed up at the victim's place, the very first thing she did before anything else was she said he left out the back and she pointed, and she pointed right at the front door of her house, or her apartment, and right through to the back where she said he left from, which is right where Mr. Omitu was seen by Officer Serna as Officer Serna drove into the apartment complex. She described his clothing. He was wearing the green shirt. He was wearing shorts. She described his race. He was a black male. There was no discussion of skin tone, of complexion, or anything like that. He was a black male as far as my clients knew at that point. And then when she first described the beard, she said sort of, but she also communicated with her body. She gestured. Yeah, just a little bit of scruff is what she did. She gestured towards the neck. The neck, right here, scruff. She went like this, Your Honor. And I'm sorry, it's not in the record that I'm gesturing. Well, we have the video, and we watched it, and we'll watch it again probably. And I think that that's consistent with a gesture. If you have this beard, the beard would be like this, wouldn't it? Gesturing towards the throat area is consistent with what Ms. House described as a James Harden beard. Couldn't they have asked him if he, couldn't they have easily asked her, does he have a James Harden beard, which is a known thing? So after they stopped him, they did develop more and more precise description of what he looked like, and she said it was a very short beard. And that should have stopped it right there. Well, no, absolutely not, because- If he has a very short beard, he doesn't have a James Harden beard. Yes, but think about the rest of the circumstances that were extant at that period. She had been communicating with Cerna on the phone for a limited period of time, and then she stopped taking his calls. In that interim, Cerna also determined that the person he was looking for had a felony warrant for his arrest. This person's demeanor was disproportionately, excessively hostile. He refused to identify himself. Is that excessively hostile, if to stand on your rights? A lot of ACLU people, which I'm not disparaging in any way, think that you shouldn't be giving your name and information, and you don't have to do that, and they teach courses on how to stand on your rights. Well, sure, and you also have a First Amendment right to stand up and declare your guilt, and that can be used against you as well. And in this particular case, the law in this circuit says that behavior and demeanor like he was exhibiting is probative on the issue of whether he's the right person. Well, we've just had a case where we made a big point of saying you don't have to give your ID. And that's fine. And that can't be, and you can't, but once, so you're saying she was lying then when she said it was a short beard? I'm not saying that. I'm saying that she could have been, and he could have reasonably believed that she was because of everything else that he knew at the time, including the fact that the one photograph, the only photograph that is any evidence whatsoever for the plaintiff in this case, that didn't even match the description that the victim was giving him. There's no beard on that photograph. And by the way, with respect to the additional information that Officer Serna obtained, she gave a better description of the suspect's behavior in the statute that more closely approximated Mr. Omitu's. The shorts, the shorts didn't quite match. The shorts did have a big black stripe on them. They were described as black basketball shorts. And then there was other information that the victim provided that neither added to or subtracted from the reasonable suspicion. Now, getting back to that photo, it wasn't the only photo that Serna saw. If you look at the video, the body-worn camera video, I believe it's exhibit two, Serna, after he obtains the name of the suspect that he's looking for, runs him in the mobile display terminal and scrolls through pictures. And I'll represent to you that the pictures that are depicted on that camera look a lot more like Mr. Omitu than the victim. The photo that the plaintiff relies on in this particular case. Can you help us about the, whether or not it was constituted an arrest because it was a seizure and a detention once they're putting him in, when he's handcuffed, he may not be under our case law, but once they're putting him in the car and transporting him somewhere he doesn't wanna go, and about, you know, and he's resisting that, why isn't that, how can that still be under the reasonable suspicion investigatory stops part? It seems like it's moved at that point. Because taking the suspect for a show up for identification is an intrinsic part of an investigatory. Right, it might be, but it's also at that point he's being held in custody because he can't leave and he's being taken somewhere. I understand the argument, but for. Can you help, what case law? The same argument would apply if, when a police officer shows his badge and tells someone to stop, that person probably feels like they're not at liberty to leave. When they're placed in cuffs for a pat down as part of a Terry stop, they probably feel like they can't leave. But that's not where our case law draws the line. Our case law draws the line when you take that person to headquarters for. You don't have to go to headquarters. They're taking him somewhere. And sometimes just sitting in the car is in custody for a long period of time. We have case law on that. And in the past year that I can think of. You described some cases a little while ago that people were taken some short distance. Did the issue of whether they were under arrest or not, was that addressed in those cases? Those were all transports pursuant to an investigatory stop. So nobody was. But was the issue raised of whether those were arrests or not wasn't discussed? I believe that they were discussed exclusively in terms of whether or not it was lawful under Terry for the officers to transport the person for a show up just as was being done in this case. So, I would point out that the court needs to look at more than one piece of the totality in order to determine whether a reasonable suspicion continued to exist throughout the process. The entire point of the case law  of what Officer Serna was doing during the entire duration of that stop was to determine whether Mr. Omitu was the person who allegedly assaulted the victim. The initial plan was to get the victim to the scene, to drive her by in a car, and have her look at Mr. Omitu and tell the officers whether they had the right person. It couldn't be done because she had children that she was responsible for. You can see that Serna was persistent in trying to get her to the scene rather than moving Mr. Omitu to her. Let me ask, when would you concede that the officer knew that this was not the person who had allegedly assaulted Davenport? So, the summary judgment evidence is that both officers, even after the victim had identified him as not her attacker, continued to believe that based on everything else that they dealt with that day, that they had got the right person. They finally understood that he was not the person that they were looking for when the FBI identity check came back as Matthias Omitu rather than as Darren Smith. All right, counsel. Thank you. Thank you. We have your argument. Ms. Stroh? Thank you, Your Honor. May it please the court. My name is Jackie Stroh and I represent the city of San Antonio. As the record reflects, the magistrate judge and the district court judge held in favor of the officers on the basis of no underlying constitutional violation. Assuming the court affirms the district court's judgment on that basis, the city cannot have any liability under Monell because under the case of Heller, absent an underlying constitutional violation, the city cannot be held liable under section 1983. Regardless, even if the court were to reverse on the issue of an underlying constitutional violation, there is zero evidence of a policy, custom, or practice under which the city of San Antonio could be held liable in this case. Although Omitu argues at various points in her briefing for a standard of vicarious liability, that is something that Monell strictly prohibits. In the district court, she pled three distinct theories of policy to hold the city liable, negligent training, negligent supervision, and negligent discipline. The elements all require, for all three are similar, they all require a failure of some sort, a failure in training, supervision, or discipline, a connection between that failure and the constitutional violation, and deliberate indifference to the plaintiff's constitutional rights, and there is no evidence of any of these elements. With respect to training, for example, there is a massive amount of evidence in the record about the training that these officers had. They not only had TCOL training, which under this court's precedent is enough to preclude liability under a failure to train claim, but their training went above and beyond. And that's all in the record. I'm sorry? That's all in the record. All in the record, Your Honor. The SAPD manual procedures are in the record. They govern specifically Terry stops, the difference between a reasonable suspicion and probable cause, the probable cause needed to arrest, the proper use of force. It's presently admonishing not to use excessive force. Elsa, is there anything about a policy relevant to these specific facts, specifically of transporting a suspect? I don't recall a policy specific about transporting suspects, but there is certainly with respect to elevating something from reasonable suspicion to probable cause, the standard for making an arrest, any sort of detention, and there's a specific policy that addresses how to use force, excessive force, et cetera. But even if there were some sort of missing policy or an absence of training on some particular aspect, the court would need a pattern or practice of similar violations. There's not a single prior instance of any sort of violation argued at all, cited at all in the brief. Does it appear anywhere in the record? When was racial profiling raised as a question? That was raised by a plaintiff in the summary judgment filings, but it was not pled. It's not pled in the complaint. There's no evidence of it anyway. In the briefing, all that's stated is a single sentence that there's a custom or policy of racial profiling. There's no citation to anything in the record that would support that. And there is, in fact, affirmative evidence that the city offered reports for several years showing that by virtue of an independent analysis of the city's own data, there is no policy or pattern of racial profiling by the city, and the city also introduced excerpts from its SAPD manual, which expressly advises the officers not to engage in racial profiling. So, and I'd just like to point out in the few seconds that I have left, that in Omitu's reply brief at page 17, in the first full paragraph, she expressly acknowledges that the officers were sufficiently trained on both the Fourth Amendment and concerning the use of excessive force. So I would bind her to that admission in her reply brief and affirm the judgment on behalf of the city because there's no evidence of any policy to hold the city liable. Thank you. Thank you. We have your argument. You've saved time for rebuttal. As to the city of San Antonio, the court held that there's three ways to show that an official policy, written policy statements, ordinances, or regulations, a widespread practice that is so common and well settled as to constitute a custom that fairly represents the city's policy or under rare circumstances, a single act can be considered a policy if done by an official or entity with final policy-making authority. And in this case, it's well-known policy. In this case, the well-known policy of racial profiling of African Americans in the city of San Antonio contributed to Mr. Omitu's constitutional injuries on August 25th, 2020. As of the date and time that I stand before you today, there is nothing that the appellees can tell you that would be distinctive from the looks of Mr. Omitu and Mr. Darren Smith, who had a warrant by their own admission for his arrest. There's nothing distinctive between them that they would tell you. The most distinctive characteristics about them, actually, the only thing that they have in common is the fact that they're both black. And I will tell you, if you go to New York anywhere, Monday through Friday, and you visit a restaurant, and I tell you a piece of clothing, white shirt, blue pants, hair on top of their head, you could not arrest a suspect at any point in time and say it fit the description of someone that had committed a crime. The description provided by the victim, or that, actually, the officer was in the lawful position to elicit the type of description that they needed in order to identify a suspect. That's not incumbent upon the victim. That's incumbent upon the officers that were responding to the scene to elicit the information that they needed if they were so well-trained. Well, assuming, Arguendo, that they were trained, both in the record evidence and according to your own statements, that they were trained, where is the final policymaker's involvement in this alleged racial profiling in this record? There doesn't seem to be any, since you wanted to start with Monell, that there's a, it's very hard to prove a Monell claim. Where is that in this record? You will see, Judge, that during, there was an investigatory, an interrogatory that was asked of Mr. Day, where it asked him specifically, and that's in the record, about whether or not excessive force was used in this particular instance, and he denied even being trained on excessive force. I'll try to find that for you. But by ratifying the excessive force of these police officers, I believe it's answerable to the constitutional injuries that Mr. Omitu sustained as a result of Officer Day's and Officer Monell's- Well, that's different. You're talking about, did the officer use excessive force, and was he trained to use, was he trained against excessive force? That's different than the whole department has a policy of racial profiling, and I thought that was what your claim was. Well, I mean, our real claim is, we believe that it's up to the jury. The question is whether or not there was a jury issue that was left to be determined, and it was a jury who we believe is a conscious of the community of San Antonio to determine all the facts pertaining to the city of San Antonio's unconstitutional policy, either by an actual written policy or an unofficial custom or practice exercised repeatedly, and there's a lot of judicial notice that can be taken as to that result. We believe, instances after instances, including this one, there was public outcry, and also you had the police chief saying, this shouldn't have happened. I don't know what more that could be provided when it comes to what is acceptable when it comes to the actions of those police officers, Judge. Well, if the police chief is saying this shouldn't have happened, then wouldn't that cut against your Monell claim? Well, the question is whether or not that this actually, just a very good question, which shouldn't have happened as to asking whether or not he should have been used ID. By the same token, the officers there did exactly that. They were in practice doing and adopting behavior that was acceptable because according to them, we were good with approaching him, arresting him, and removing him from and infringing upon his Fourth Amendment right. It happened. It was rubber stamped and it happened because if it wasn't supposed to happen, it wouldn't have happened. Thank you. We have your argument. This case is submitted. We appreciate all the arguments in the case. Thank you.